974 F.2d 1333
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
William Dale STRICKLAND, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Victor Ray MITCHELL, Defendant-Appellant.
 Nos. 92-5052, 92-5053.
 United States Court of Appeals,
Fourth Circuit.
 Argued: July 10, 1992
Decided: August 28, 1992
 
 Argued: Thomas Norman Cochran, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant Strickland; Farris Allen Duncan, Langston & Duncan, Goldsboro, North Carolina, for Appellant Mitchell.
 David Paul Folmar, Jr., Assistant United States Attorney, Raleigh, North Carolina, for Appellee.
 On Brief: Margaret Person Currin, United States Attorney, Raleigh, North Carolina, for Appellee.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Defendants Strickland and Mitchell pled guilty to bank robbery, in violation of 18 U.S.C. § 2113(a). Each was sentenced within the applicable Federal Sentencing Guidelines range. They now appeal their sentences, claiming that they were entitled to downward departures from their guideline ranges, and that the district court's refusal to depart was based on its erroneous belief that it lacked the authority to do so. Finding on the record no credible evidence to support Defendants' contention that the district court misapprehended the scope of its authority under the Federal Sentencing Guidelines, we affirm.
 
 
 2
 * In the Spring of 1991, Strickland, while serving time in a North Carolina state prison, was visited by Mitchell and Barefoot,* who told him that they recently had robbed two banks successfully. After Strickland's release from state custody, the three men agreed to perpetrate a third robbery. According to Strickland, Mitchell and Barefoot began preparations by stealing a car that would act as a get-away vehicle. After the car was stolen, Strickland drove it to a warehouse to conceal it until needed for the robbery.
 
 
 3
 On April 10, 1991, the three men traveled to Raleigh, North Carolina, in search of a bank to rob. Barefoot drove the stolen car, followed by Mitchell and Strickland in Mitchell's car. Strickland claims that they first "cased" an unnamed bank in Raleigh, but "chickened out" and did not go through with that robbery. Barefoot then drove the stolen car to a parking lot in the vicinity of the Centura Bank in Raleigh. Mitchell and Strickland followed in Mitchell's vehicle. Both Mitchell and Strickland admitted that they drove to the site in preparation for a robbery, but each claimed that they thought the others would again "chicken out." Both men maintain that they never really expected to go through with the robbery. After consulting in the parking lot, Mitchell got into the stolen car with Barefoot and drove off to rob the Centura Bank. Strickland stayed behind in Mitchell's car (the "jump car") to await their return.
 
 
 4
 At the bank, Mitchell waited in the stolen get-away car while Barefoot went inside. Barefoot presented a teller with a note stating that he had a gun and that the teller should place money in his briefcase. The teller put cash in the case, plus "bait bills" and a dye pack. After Barefoot reached the get-away car, the dye pack exploded. Barefoot discarded the money and briefcase and fled the scene in the get-away car driven by Mitchell. They returned to the parking lot, where Strickland was waiting with the jump car.
 
 
 5
 Soon after the April 10 robbery, Mitchell turned himself and his compatriots in to agents of the Federal Bureau of Investigation. His motivation for doing so is unclear, although it appears from the record that he was in state custody at the time on unrelated charges and may have hoped to gain favorable treatment by offering information about the bank robberies.
 
 
 6
 A grand jury handed down a three count indictment: two counts for the two robberies that took place before Strickland was out of prison and one count for the April 10 robbery of the Centura Bank in Raleigh. The defendants were not charged for a fourth attempted robbery that was thwarted when they were unable to force open the back door of a bank.
 
 
 7
 Strickland pled guilty to Count Three, the only count he faced. Mitchell pled guilty to Count Three with an agreement that the government would dismiss Count Two. At sentencing the court found that Strickland had a total offense level of 20 and a criminal history category of VI, resulting in a sentencing range of 70 to 87 months. As to Mitchell, the court determined that his total offense level was 20, and his criminal history category was III, resulting in a sentencing range of 41 to 51 months. Both Strickland and Mitchell requested that the court consider departing downward from their sentencing ranges. As justification for downward departures, Strickland and Mitchell pointed to what they claimed were unique circumstances surrounding their involvement in the robberies.
 
 
 8
 The district court conducted a thorough sentencing hearing, giving each man an opportunity to explain his conduct. Ultimately the court declined to depart downward from either defendant's guideline range, sentencing Strickland to 84 months' imprisonment and Mitchell to 48 months' imprisonment.
 
 
 9
 Both defendants now appeal their sentences on the ground that the sentencing court's refusal to grant downward departures was based on its mistaken view that it lacked authority to do so.
 
 II
 
 10
 Strickland and Mitchell correctly point out that the Federal Sentencing Guidelines vest sentencing courts with the discretion to depart from a guideline-specified sentence where the court finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." U.S.S.G. § 1A4(b); 18 U.S.C. § 3553(b). The Commission intends sentencing courts to treat each guideline as carving out a set of typical cases embodying the conduct that each guideline describes. U.S.S.G § 1A4(b). When a sentencing court encounters an atypical case, where the conduct at issue significantly differs from the norm for the given offense, the court has discretion to determine whether a departure is warranted. Id.
 
 
 11
 When a sentencing court decides not to depart downward from a guidelines-specified range, review of that decision is severely circumscribed. Title 18 U.S.C. § 3742(a) authorizes courts of appeal to entertain a defendant's challenge to his sentence only where the defendant asserts that the sentence (1) was imposed in violation of law; (2) is based on an incorrect application of the Guidelines; (3) is greater than the sentence specified in the guideline range; or (4) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable. As a general rule, a defendant's challenge to a sentencing court's refusal to depart downward falls into none of these categories, and, therefore, courts of appeal will decline to review such decisions. See United States v. Bayerle, 898 F.2d 28, 30 (4th Cir. 1990).
 
 
 12
 There is, however, one narrow exception to the general rule of nonreviewability of a sentencing court's refusal to depart downward from a guideline range: when a sentencing court's refusal to depart is based on its erroneous belief that it lacks discretion to do so, the sentence imposed by the court is in violation of the law, and a court of appeals may, under 18 U.S.C. 3742(a)(1), entertain the appeal. See id.
 
 
 13
 Here, Strickland and Mitchell attempt to circumvent the general rule of non-reviewability by framing their argument as a challenge to the district court's mistaken belief that it lacked the authority to depart downward from the guideline ranges applicable to their offenses. Neither defendant, however, offers credible proof that the court that sentenced them was under the mistaken impression that it lacked authority to depart.
 
 
 14
 At Strickland's sentencing hearing, he maintained that he was entitled to a downward departure because his participation in the robbery of the Centura Bank was atypical and therefore outside the scope of the conduct that the Sentencing Commission had in mind when it established the punishment for bank robbery. The purportedly atypical circumstances that Strickland pointed to were the facts that he stayed in the "jump car," and was thus removed from the robbery, and that, based on the trio's earlier "chickening out," he did not expect his compatriots actually to rob a bank on that day.
 
 
 15
 After hearing these proffered justifications for a downward departure, the court decided to sentence Strickland within the applicable guideline range. In refusing to depart downward, the judge commented that "[t]here isn't a legal basis" for departure. Strickland interprets this remark to mean that the judge thought that he had no power to consider a downward departure. We disagree.
 
 
 16
 A review of the entire record of Strickland's sentencing hearing reveals that after his attorney requested a downward departure, the court gave Strickland an opportunity to tell his story and justify his request for such a departure. The court then, in the exercise of its discretion, decided not to depart from the range. Taken in context, it is evident that when the judge commented that "there isn't a legal basis" for a downward departure, he meant only that Strickland offered absolutely no credible proof that his participation in the robbery of the Centura Bank was so atypical that it fell outside of the range of conduct contemplated by the Sentencing Commission when it established a sentencing range for bank robbery.
 
 
 17
 The record clearly reflects that the district court did entertain Strickland's request for a downward departure, and that the court affirmatively exercised its discretion in declining to so depart. Because such an exercise of discretion is not reviewable under 18 U.S.C. 3742(a), we "have no occasion to review [Strickland's] assignment of error on its merits ...," Bayerle, 898 F.2d at 32, and we affirm Strickland's sentence.
 
 
 18
 Mitchell offers no evidence from his sentencing hearing or elsewhere to support his bald assertion that the district court failed to depart downward because it erroneously assumed that it lacked the authority to do so. In fact, an examination of the record supports the opposite conclusion. After counsel for Mitchell requested a downward departure, the court gave Mitchell ample opportunity to justify such a result. Mitchell claimed that his participation in the robbery of the Centura Bank was atypical both because he did not expect the robbery actually to take place, and because, after the robbery, he turned himself and his comrades in to the F.B.I. After hearing Mitchell's argument, the district court found not only that his participation was not atypical, but that he was, in all probability, a moving force behind the scheme to rob banks. Accordingly, the court sentenced Mitchell at the high end of his applicable sentencing range.
 
 
 19
 The record as a whole clearly reflects that the district court exercised its discretion not to depart downward from Mitchell's guidelines range. We therefore decline to examine the merits of his claim, and affirm the sentence imposed by the district court.
 
 AFFIRMED
 
 
 *
 Barefoot, who was convicted of bank robbery along with Strickland and Mitchell, does not appeal his conviction